JUNE.

## THE MARINE BANK OF BALTIMORE VS. BIAYS.

*In an action against an incorporated bank, the defendants by their corporate name of, The President and Directors of the Marine Bank of Baltimore. The declaration is against the said Marine Bank; the plea was, that the Marine Bank did not assume, and the verdict and judgment used the corporate name— Held, on objections made to the declaration, that it was sufficient.*

*J B being indebted to the M. Bank, for loans of money to the amount of 7900 dollars, and being the owner of 380 shares of stock in that bank, upon which all payments previously required by the bank had been made to the amount of $7600, did at the request of the bank empower H W, the president, to transfer the 380 shares, who made the transfer to himself, in trust for the bank, to secure the payment of the above $7900, and interest due thereon. The bank, agreeably to their charter, afterwards called on the stockholders to pay an instalment of $5 on each share of stock by the 1st of April 1811, which instalment J B failed to pay. H W on the 27th of March 1812, by direction of J B, transferred the 380 shares to N S, and J B then paid the bank the $7900 with all interest then due. The bank declared two dividends between the 1st of April 1811, and the 27th of March 1812. To recover the amount of these dividends J B brought an action of assumpsit against the bank—Held, that J B, by his neglect to pay the said instalment of $5, forfeited his claim to the two dividends declared by the bank, and that he had no right to sustain the action.*

APPEAL from *Baltimore* County Court. *Assumpsit for* money paid, laid out and expended; for money lent and advanced, and on an *insimul computassent.* In the writ of summons which issued, the defendants, (now appellants,) are named *The President and Directors of the Marine Bank of Baltimore.* To this writ they appeared and imparled, &c. In the declaration it is stated, "that whereas the said *Marine Bank* on," &c. and that the money was paid and lent, &c. at *its* special instance and request; and the defendants named the *said Marine Bank,* or the *said Bank,* throughout the declaration. In the other parts of the record, they are named as in the summons. The general issue was pleaded, that the said *Marine Bank* did not assume upon itself, &c. And at the trial the plaintiff, (the appellee,) proved, that he, being indebted to the *Marine Bank of Baltimore,* the defendants, for loans of money previously made to him upon the promissory notes of *G. Stiles,* endorsed by him the plaintiff, to the amount of $7900, and being the owner of 380 shares of the stock of the said bank, upon which he had made all payments previously required by the bank to the amount of $7600, did at the request of the defendants, on the 8th of February 1811, execute and deliver a power of attorney to *H. Waters,* the president of the bank, authorizing and empowering him, for him the plaintiff, and in his name, to assign and transfer the said 380 shares of stock, standing in his name on the books of the said bank. He also proved that *Waters* afterwards, on the 14th of February 1811, did in pursuance of this power of attorney, and agreeably to the by-laws and rules of the bank, transfer on the books of the bank the 380 shares of the stock to himself, in trust for the defendants; it being understood, that the transfer was intended to secure the payment of the said loans, and interest due thereon, and that upon the payment thereof the said stock was to be transferred back to the plaintiff. He further proved, that the directors of the bank did, according to the act of assembly incorporating the stockholders thereof, and in conformity to the provisions of that law,

1818.

Marine Bank
vs
Biays

call on the stockholders to pay an instalment of $5 on each share of stock at the bank, on or before the 1st of April 1811, and that the plaintiff failed to make regular payment of the instalment so called for; and that *Waters* did, on the 27th of March 1812, by the direction of the plaintiff, transfer the said shares to *N. Stansbury*, on which day the plaintiff did pay to the defendants the said sum of $7900, with all interest due thereon. He also proved that the bank declared two dividends after the 1st of April 1811, and before the 27th of March 1812. The defendants then moved the court to direct the jury, that if they believed this evidence, the plaintiff was not entitled to recover any dividends made by the bank after the 1st of April 1811, and before the 27th of March 1812, the same having been forfeited by reason of the nonpayment of the instalment required to be paid. This direction the Court, [*Bland*, A. J.] refused to give, and the defendants excepted; and the verdict and judgment being against them, they appealed to this court.

The cause was argued before CHASE, Ch. J. and BUCHANAN, EARLE, JOHNSON, and MARTIN, J.

*Martin* (Attorney-General,) for the Appellants. 1. The bank was incorporated by the name of *The President and Directors of the Marine Bank of Baltimore*, and the suit is properly brought against them by their corporate name; but the declaration is against *the said Marine Bank*, which is not the corporate name of the defendants. The plea is, that the *Marine Bank* did not assume, and the verdict is, that the President and Directors, &c. did assume, and the judgment accordingly. There is no such corporation as the *Marine Bank*, and "*the said Marine Bank*" cannot mean *The President and Directors of the Marine Bank of Baltimore*. The making up the issue cannot aid the plaintiff, if the issue tendered was an improper one. Nor can the verdict cure the defect. There is, therefore, no declaration against the defendants. 2. It does not appear that any dividends were made of the stock in question. 3. The forfeiture of dividends was intended to secure the punctual payment, by the stockholders, of the instalments, as they were called for. The bank had no interest to pay up the instalment on the plaintiff's stock, because he was personally liable. The payment of the instalment was not necessary to keep the stock in existence; it was only intended to secure the future dividends. 4. The bank had no money belonging to the plaintiff out of which the instalment could have been paid. 5. These shares of stock were not entitled to dividends, because when the instalments were not paid, the law says no dividends shall be declared on them. 6. If the legal title to the shares was in the bank, how could the plaintiff claim dividends? If the plaintiff was the owner of the stock for the purpose of receiving the dividends,

he was the person who should have paid the instalment when the call was made.

*Winder*, *Williams* and *R. Johnson*, for the Appellee. With respect to the alleged defect in the declaration it is now too late, admitting it to exist, to take advantage of it. It should have been pleaded in abatement. 5 *Com. Dig.* (2 B, 2) 569. *Mayor, &c. vs. Bolton*, 1 *Bos. & Pull.* 40. The defendants are properly named in the summons which issued against them, they came voluntarily into court, and were declared against as the *said Marine Bank*, which is a part of their corporate name, and the word *said*, couples that part with the rest of the name. The declaration draws with it the writ, which it is supposed to recite. It is enough that the whole name is once expressed, it being afterwards as completely comprehended by the relative expression *said*, as if it were repeated over. It is the same as where in ordinary cases the surname is omitted and the christian one only used. Sometimes only one of many christian names is used, and sometimes the relation of the party to the suit is merely stated as *defendant* or *plaintiff.* 1 *Chitty's Plead.* 248. *Conner vs. Conner*, 2 *Wils.* 386. By pleading to the declaration, the defendant admits it to be good, as well as the writ. 5 *Bac. Ab.* tit. *Pleas*, &c. (A) 328. They also referred to 1 *Kyd on Corporations*, 283, 285, 286, 287, 288. But the defect, if any, is cured by the verdict. *Harvey vs. Peake*, 3 *Burr.* 1793. *Palmer vs. Stavely*, 1 *Ld. Raym.* 669.

The facts in the case are in favour of the plaintiff below: When the instalment was called for the plaintiff was not the legal holder of the stock, but the right was in the bank, who ought to have paid the instalment. Suppose all the stockholders had made default, yet dividends must have been made amongst them. Here the stock was held by the bank, and it could not be forfeited. The bank is considered as an ordinary mortgagee. When mortgagees are in possession of the mortgaged premises or articles, they are bound to pay taxes, keep them in essential repairs, and, if it be living property, to afford it nourishment. 5 *Bac. Ab.* tit. *Mortgage*, (C) 20, (F) 103, 107. Still more are they bound to do that which will prevent a forfeiture of ordinary property. And even if the expenses incurred to preserve the property do not increase its value, justice and equity require they should be advanced, and the same may be charged to the mortgagors *Abbott on Shipping*, 19, 20. *Jackson vs. Vernon*, 1 *H. Blk. Rep.* 114. *Westerdall vs. Dale*. 7 *T. R.* 308. *Hodgson vs. Butts*, 3 *Cranch*, 144, 2 *Fonbl.* 354. *Newall vs. Wright*, 3 *Mass. Rep.* 138. Here, however, the mortgaged article was enhanced in value exactly to the extent in which the advances would have been made. It increased the capital just so much; of course the property mortgaged remained of equal value to secure the mortgaged debt. If the stock was an adequate security when taken, it did not become less so by such an

increase of the mortgaged debt, as the advances would have caused, since the mortgaged article was equally increased in value. It remained as it was when taken, sufficient to secure the payment of the debt and of the advance; and the interest also was more than guaranteed by the dividends on the advance, the dividends being more than 6 pr. cent.

This call of an instalment, which it is pretended was not paid by the plaintiff, and that thereby dividends were forfeited, was a forfeiture made by the defendants themselves. They were the *legal owners* of the stock, and of course ought to have paid the instalment. The plaintiff had no right, and was clearly under no obligation to meddle in the matter. Could a mortgagee cause himself a forfeiture in his own behalf against the mortgagor? He certainly could not. 5 *Bac. Ab.* tit. *Mortgage,* (F) 103. Here the bank could not be deficient to itself. It is a mere omission to make the entries in their books. Such a clerical omission is not to cause important legal consequences. The plaintiff could not control those entries. It was extremely unjustifiable and immoral, and believed to be wholly illegal, that the bank should, by a trick, in omitting to make two entries in its books, not only cause such a loss to the mortgagor, but thereby gain the whole of that loss to themselves. Thus converting their own criminal and dishonest conduct into a profit to themselves, and producing a correspondent loss to their mortgagor. This action for money had and received, is an equitable action; and it is evident that the bank, by the forfeiture, received more than their mortgaged debt. It cannot be said that no dividends were made on the stock in question, for the bill of exceptions admits that dividends were made. And it is also said the dividends were forfeited, which necessarily admits their having existed. The act of incorporation does not say there shall be no dividends, but only that such dividends shall not be paid over. 1810, *ch.* 66, s. 8. Suppose an instalment is called for on the 1st of May, and a dividend to be declared on the 15th of May, and there is a forfeiture, can it be said that the whole dividend is forfeited? No, it is not to be paid to the person making default. Suppose he pays on the 17th of May, then the dividend is to be calculated so as to omit the two days. What is done with the dividend during the forfeiture? Is it paid away to the rest of the stockholders?

*Martin,* (Attorney-General,) in reply. There is no doubt that a person sued by his right name, may be declared against by his christian or surname. But it it is denied that the defendants have either a christian or surname. There is no objections to the use of pronouns, but here the pronoun *it* has been used, and why so used is inconceivable. How can *the said Marine Bank,* by any construction mean *The President and Directors of the Marine Bank of Baltimore?* Can the pronoun *it* relate to *The President and Directors,* &c.? The plea and issue thereon joined is, that

the *said Marine Bank* did not assume, and the verdict is that *The President and Directors*, &c. did assume. If the plaintiff was divested of all interest, both legal and equitable in the stock, how can he make this demand? He had either transferred away all his interest, or he was bound to pay the instalment. The bank had no more interest than the plaintiff had. The object for calling for an instalment was to bring money into the bank; and the bank could make no entry on their books so as to comply with the call. The plaintiff had no funds in the bank to meet the call. It could not be complied with by him, or by any one for him, except by bringing the instalment into the bank. What is the instalment? It is part of the consideration money which the plaintiff owed for the stock. Unless the instalment was paid, nothing was yielded by the payment of the preceding instalments to benefit any one. There was a general power given by the plaintiff to *Waters* to transfer the stock, and he did transfer it to himself, in trust for the bank, without any thing to shew that it was for the benefit of the plaintiff, or in trust for him. Nothing remained in the plaintiff to entitle him to any dividend; but if he was entitled to the dividends, he was bound to pay the instalment. Neither the plaintiff, nor the bank, had the legal title in the stock—it was in *Waters*, and no default is chargeable to the bank. The stock was transferred to *Waters*, in trust for the payment of the debt due from the plaintiff to the bank, and after such payment, it was a resulting trust for the plaintiff. Suppose the bank had paid the instalment, had they any security to compel the plaintiff to refund? They certainly had none. If this is admitted, then it is admitting that the plaintiff ought to have paid the instalment. The bank could not call upon the plaintiff, unless he was bound to pay. If a mortgagee pays money for the mortgagor, it is upon the principle that the mortgagor ought to have paid it, but if he pays when the mortgagor was not answerable, then he cannot call on the mortgagor for the money paid. If a mortgagor owing a part of the purchase money for the land, mortgages it, the mortgagee is not bound to pay the debt. He may do so for the purpose of securing his own debt. A mortgagee is not bound to comply with the mortgagor's engagements, if he does it, it is because he has his remedy over. What are the expenditures which a mortgagee in possession is obliged to incur? He is not obliged to lay out more money than is sufficient to keep the premises in necessary repairs. He is not bound to enhance the value of the premises. Here the bank was not bound to pay the instalment so as to enhance the value of the stock. The plaintiff was as much in *possession* of the stock after as he was before the transfer. It was no more than the executing a mortgage without changing the possession. Payment by the bank would have been increasing a fund to pay the plaintiff's debt. He knew he owed for the stock any instalment that might be called. Suppose the stock was only equal to the payment of the

bank debt, and the bank had paid the instalment, and it had turned out that the dividend was only a small *per cent.* and the price of stock had fallen, it would be so much lost to the bank. It was a risk the bank did not choose to run. The plaintiff could receive no dividend but such as accrued after the payment was made good, by calculating from the time when the payment was made. All profit made upon the stock of the bank is divided among the stockholders. If there is any forfeiture by not complying with calls for instalments, the profit on the stock forfeited goes into the general fund, and although the person who forfeits receives no dividend, yet that profit is divided among all the other stockholders who do comply with the calls of the bank. If the whole profits are not divided, (as it often happens that a surplus is reserved,) then it goes into the general fund, to be divided at a future day amongst all the stockholders who may have complied with the calls of the bank up to that day.

CHASE, Ch, J. delivered the opinion of the court. After stating the case, he proceeded as follows. The court are of opinion, that the 380 shares of stock were deposited in the hands of the defendants below as a pledge to secure the payment of the loan made to the plaintiff, with interest, and that the defendants had no right to appropriate the pledge, or any part thereof, without the consent and by the direction of the plaintiff, to any use or purpose; and that the plaintiff had no power of disposition of the shares until the loan, with interest, was satisfied, without the concurrence of the defendants, because thereby the security would have been diminished. That the defendants had no money in their hands, belonging to the plaintiff, to pay the instalment, and were under no obligation to advance money for him, and thereby increase the debt due to the bank from him. And if the defendants considered the shares so pledged as amply sufficient to secure the debt, it was not compatible with their duty as trustees, for the stockholders to divert the funds of the bank from their ordinary and legal appropriation, to pay the instalment due from the plaintiff, and thereby free him from the penalty he would have incurred by not complying with the call, which the interest of the bank had rendered necessary. And such conduct in the defendants would have made that provision of the law nugatory as to the plaintiff, which was intended to secure punctuality in the payment of instalments, and the interest of the other stockholders would have been diminished, by such improper interference, to the amount of the dividends on the said stock, which became a part of the common funds of the bank, and the defendants would have been justly chargeable with partiality in such application of the funds.

If the sufficiency of the pledge had been doubtful, prudence and sound discretion would have dictated the pro-

priety of the payment by the bank to render the debt se-
cure.

The court are of opinion, that the plaintiff, by his refu-
sal or neglect to pay the instalment of $5 on each share of
stock thus pledged, forfeited his claim to the two dividends
declared by the defendants, and that he had no right to sus-
tain the action in this case.

The court do not consider that the objections raised to
the declaration are sustainable.

JOHNSON, J. having stated the facts, thus proceeded—
Whether or not the court below erred in the opinion given
by them, is now for the consideration of this court

The action for *money had and received* will be sustained
if the plaintiff has an equitable right to the money; and
the case must rest and depend on the same principles that
would govern the decision if the cause was now before a
court of equity.

Before I proceed to the examination of those principles
that ought, in my opinion, to govern the cause, let us take
a view of the relative situation of the parties.

The bank, aware of the call it had made on the stock-
holders for payments, receive the stock in question. Over
it the bank acquired the *legal interest*, backed with an
*equitable right* to the extent of the debt due. The money
paid on that stock, even without the additional responsibility
of the plaintiff, as the endorser of the notes, together with
that of the drawer, was an ample, and more than ample
security for the debt. The sum paid on the stock was on-
ly $300 less than the debt itself, and the stock itself,
as it then stood, worth more than the sum due. The di-
vidends on the stock in its then situation, would have
exceeded the interest on the debt more than $130—the one
limited to six, and the other never dividing less than eight
*per centum.*

When those parties were thus situated, was it equitable
or just for the bank to receive the stock, with an intention
to demand $1900 more to be paid thereon, and in case of
failure to claim all the profits such stock would otherwise
have drawn? Is it consistent with equity or justice, and in
a court of chancery could such a demand be set up under
any *pretext or denomination whatever?* I cannot for a mo-
ment believe that in that court, whose power it is to *relieve
from,* and *not enforce forfeitures,* that such a question
would bear a moment's consideration.

The object of the clause in the act of incorporation, on
which the plaintiff's demand is resisted, most unquestion-
ably was to draw more money into the bank to meet its en-
gagements, or to further its operations; and no one could
question its right to detain, from the delinquent stockhold-
ers, the dividends, and either keep them in the vaults of
the bank, or divide them immediately amongst the punc-
tual stockholders, as they conceived most advantageous for
the institution, when there was no *other connexion than
that of a mere naked stockholder.* But it will not follow

that the same consequences are to result when the connexion of the bank with the stock is more intimate. If the bank had obtained the equitable as well as legal right to the stock in question, then, as to the bank, and as to all who were interested in the institution, this stock would have drawn the *same interest, whether the instalments called for were paid or not;* for as the bank, as such, has no funds, and only uses those of the stockholders, if money had been paid on those shares, it must have been the money of the stockholders remaining in the bank—a surplus fund undivided; and, therefore, when the dividends were struck, the stockholders would receive the same sum, either as their interest in the stock thus increased, and less out of the surplus fund, or more out of that fund, and less on account of the stock. A payment, therefore, on stock owned by the bank, could add nothing to its funds—it would bring no money into the bank. The simple operation would be to give a different destination to that which was already there.

But it is urged that here the bank had not an absolute interest in this stock; certainly such is the fact; for if it had an absolute indefeasible interest, then this suit never could have been conceived, as the plaintiff would have had no part or lot in the matter. But the bank had the legal, and to a large extent, the equitable interest also; and yet we are told, and I may say only told, that the bank, the mortgagee of this stock, was not bound to do those acts, if any were to be done, to keep the stock (if I may so express myself,) in full existence, and not suffer it, as to the interest of the mortgagor, to be completely prostrated. Now let it for a moment, for argument sake, be admitted, that the bank was not *bound* to make the payments; yet it cannot be controverted by any one the least conversant with the principles by which a court of chancery is governed, that if *ex gratia,* the payments had been made, the dividends in question must have been accounted for to the mortgagor, either by applying them to sink the debt, or by a payment over, that being discharged. But we have already seen that such a payment could not have added to or diminished in the slightest degree the interest of the institution. By the act of incorporation the stock is to be transferred on the books—those books, and those alone, will then disclose the stockholders. At the time when the money in question was called to be paid, the bank, by its president, was the holder. Now let it be yielded, that the officers of the bank would have received the payment if the plaintiff had offered the money, yet, if received, it must have been received as if paid by the president, and added to the increase of the stock. The name, or the agency of the plaintiff, could not have appeared in the transaction. If then the payment must appear (if it had been made,) to have been made by the president of the bank, is it, on principles of equity and justice, certain that he

was bound to have caused such entries to be made as would have kept the stock in full power?

It has already been established to my comprehension, that an actual payment of money out of the surplus funds, or an entry made on the books, purporting that the payment was made, could not have affected the interest of those concerned in the institution. It remains to be considered, whether, if the one or the other was necessary to keep the stock in active operation, the defendants were not bound so to have done? And if they were, then it must be conceded, they have no right to retain the money in consequence of their own neglect or fault.

The able counsel who conducts this case on the part of the bank, as is usual with him, when he cannot bring books to support the principles he contends for, concedes those brought to bear against him, but draws out of his own fertile imagination nice distinctions, just suited to cover his case.

It is unquestionably established that a mortgagee in possession, is bound to do those acts, to keep the premises fit for a beneficial use; and that if he makes no profits, from neglecting to do so, he must account as if he had. 5 *Bac. Ab. tit. Mortgage,* (F) 104. It is also clear that he is bound to perform all covenants running with the thing mortgaged; that he is bound to do all acts that are necessary to prevent the mortgaged premises from being forfeited. *Pow. on Mort.* 264, 266.

But it is said those principles have no bearing on the case. To my mind each and every of them sanctions the plaintiff's right to recover the money in question.

If the mortgagee is compelled to repair, to keep the mortgaged property fit for use, which can only be done by incurring expense, *a fortiori,* (if it be necessary,) were the defendants bound to make the payment, or entries; for neither the one nor the other could in the slightest degree have diminished the interest or dividends of the stockholders. If the mortgagee is bound to comply with the covenants running with the mortgaged premises, then, as the demand in question was bottomed on the *covenant* that the stock should cease to divide in case the demand was not met, *which runs with the stock*, the mortgagee was bound to have met it, to have avoided such forfeiture.

But it is contended that the demand was not founded on a covenant connected with the stock itself, but that the sums called for were part of the original purchase money. The reverse is the case; for if the demand was founded on a debt due from the plaintiff at the time he became a stockholder, then, it would follow, that the noncompliance with the call, would subject him to a suit for the money; and yet, it is apprehended, that none who question the decision of the court below, will go to the extent that he might have been sued for the money. This remark answers also the argument on the part of the appellants, that a subsequent mortgagee is not bound, before he can resort to the

1818.

Marine Bank-
vs
Biays

mortgaged premises, to discharge the prior mortgage, supposing such an argument to have the least applicability to the case before the court. But it seems to me to have no bearing; for, in no instance could the subsequent mortgagee resort to the property until such prior mortgage was discharged, or unless it was adequate to both, and then no contest could exist.

That the claim for a forfeiture on the noncompliance with the call, is evidently founded on a covenant running with the stock, appears from its resting on the terms of the law under which the stock is taken—each party agreeing to those terms. If such a clause had not been inserted in the law, then no demand could have been made, producing such an effect. The principle, that the mortgagee in possession is bound to do all acts to prevent a forfeiture, powerfully bears on the present case; for, if the mortgagee of leasehold property is bound to pay the rent to avoid a forfeiture to a stranger, which requires the *advance* of money on his part, how much more strong is the case here against the mortgagee, where no money need have been advanced, and when he himself claims such forfeiture?

But it is urged that the case before the court is not to be governed by those principles that apply to mortgagees in possession. For it is said, if the mere act of executing a mortgage makes a mortgagee in possession, then all mortgagees are mortgagees in possession. But as a distinction exists between them, therefore the merely executing a mortgage can have no such effect. No person can suppose the mortgage itself constitutes a mortgagee in possession. But the case before the court never could have existed if the bank had not been in possession, possessing such property as the property in question, in the way, and only way, it could be possessed—receiving all the profits immediately as they became due.

But it has been observed, that the stock was not transferred to the bank, but to *H. Waters*, and that supposing if it had been transferred to the bank, on the facts in the cause, the dividends could not have been withheld; yet that circumstance varies the case. It does not appear to me in any manner to alter the question; for as he was the president and agent of the bank, it must be affected by his conduct, and I know of no other way of transferring to the bank, except through the instrumentality of the president thereof.

Against the plaintiff's demand it is also urged that the defendants are not liable, because the dividends in question have been distributed amongst the stockholders. This ground is as defenceless, in my opinion, as those already considered. If tenable in this case, it must in all cases prevent any money from being received, no matter how unjustly it was detained, provided they have paid it away. By the charter the bank is to be sued in the name of the president and directors—the stockholders are not liable to be sued as such for the conduct of the bank, and they can

only be come at through the president and directors. If by the injustice of the president and directors, or by the misconception of the rights of the stockholders, they pay away to one or more, more money than he or they were entitled to receive, the president and directors are liable to the person injured, whose money was thus unjustly paid away, whether the same proceeded from the purest or most unworthy motives; and their remedy is against the stockholders—a remedy in their own hands; for if compelled to pay, as in this case, there will remain, to the extent of the recovery, less to be distributed.

JUDGMENT REVERSED.